UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | Criminal No: 24-CR-10325-DJC |
| ) | |
| CHRISTOPHER SHEERER, ) | |
| ) | *Leave to file with redactions granted* |
| Defendant. ) | *January 22, 2026* |

## GOVERNMENT'S SENTENCING MEMORANDUM

Christopher Sheerer is a father who was entrusted with the care of ▇▇▇▇▇▇▇▇▇▇. He violated that trust in one of the most tragic ways imaginable: by leveraging his access to ▇ to create CSAM, which he then used as currency to gain access to a group of like-minded individuals—that is, other men with access to young children who create and traffic in imagery of their defilement. For the reasons discussed below and in the victim impact statements filed under seal, and for reasons to be articulated at the sentencing hearing, the government respectfully requests that this Court impose a term of incarceration of 540 months (45 years) and 60 months (five years) of supervised release.

## FACTS

The government relies on and incorporates the facts as set forth in the statement of offense conduct in paragraphs 8 through 29 of the Presentence Investigation Report ("PSR").

Essentially, the defendant, a pediatric anesthesiologist with a young ▇▇▇▇▇ ▇▇▇▇▇▇ became a member of a group on an encrypted chat platform that was designed to give adult men with access to children a safe space to discuss and share the sexual exploitation of children and locate members close enough to meet up for "playdates" – that is, in-person abuse. The defendant used burner accounts in a pseudonym to avoid detection, but was ultimately caught when law enforcement gained access to the group and traced the accounts to the defendant while he was

working as a doctor in Baltimore. Shortly after identifying him, Homeland Security Investigations moved quickly to search and seize evidence from the defendant's new home in Boston shortly after he began working at a children's hospital in Boston. During that phase of the investigation, agents recovered evidence of the defendant's active participation in the "███████" group, including images and videos documenting his exploitation of Minor A and distribution of that imagery to other members of the group, and found that he belonged to other CSAM groups on the platform as well. The defendant was arrested in the days leading up to ███████ ███████████████. In addition to homemade child sexual abuse material (CSAM) █████████, the defendant had received, distributed, and possessed thousands of CSAM images and videos.

## DISCUSSION

**I.**     **Sentencing Guideline Calculation**

Based on its assessment of the defendant's total offense level as 43 and his criminal history category as I, the United States Probation Office ("Probation") has computed a Guidelines sentence in this case to include a term of incarceration for life (capped at the statutory maximum, 840 months) and supervised release from five years to life.

The government agrees with Probation's calculation of the defendant's Offense Level and Criminal History Category and thus agrees with its determination of his Guidelines Sentencing Range (GSR) as outlined above. The government agrees with Probation's treatment of the defendant's objections, for the reasons set forth below.

**A.  Burden of Proof for Enhancements**

As a threshold matter, the government must prove the applicability of a sentencing enhancement by a preponderance of the evidence. *United States v. Flete-Garcia*, 925 F.3d 17, 26

(1st Cir. 2019).

The defendant maintains that sentencing enhancements should be proven by clear and convincing evidence, given their "enormous impact." This minimally-developed argument is meritless and unsupported by relevant precedent. In *McMillan v. Pennsylvania*, for example, the Supreme Court <u>rejected</u> due process and Sixth Amendment challenges to the use of the preponderance standard in determination of facts relevant to sentencing. *Id.*, 477 U.S. 79, 91-93 (1986). Furthermore, the Ninth Circuit case the defendant cites is no longer good law. *See United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024) (due process did not require district court to find facts supporting sentencing enhancement by more than a preponderance of the evidence, overruling *United States v. Jordan*, 256 F.3d 922 (9th Cir. 2001) and similar cases). Nearly every Circuit, including the one binding, has reached the same conclusion. *See United States v. Walker-Couvertier*, 860 F.3d 1, 17 (1st Cir. 2017); *United States v. Vaughn*, 430 F.3d 518, 525 (2d Cir. 2005); *United States v. Grubbs*, 585 F.3d 793, 802–03 (4th Cir. 2009); *United States v. Brika*, 487 F.3d 450, 461–62 (6th Cir. 2007); *United States v. Reuter*, 463 F.3d 792, 793 (7th Cir. 2006); *United States v. Villareal-Amarillas*, 562 F.3d 892, 897–98 (8th Cir. 2009); *United States v. Robertson*, 946 F.3d 1168, 1171–72 (10th Cir. 2020); *United States v. Arcila Ramirez*, 16 F.4th 844, 855 n.8 (11th Cir. 2021); *United States v. Mohammed*, 89 F.4th 158, 164–65 (D.C. Cir. 2023).

The only First Circuit case the defendant cites, without analysis, to support his position is inapposite. There, the defendant was acquitted of murder in state court, prosecuted and convicted in federal court for a possessory firearms offense, and sentenced to life based on the application of a cross-reference in the pre-*Booker* non-advisory Guidelines that resulted in his being sentenced to a mandatory term of life because of the district court's finding by a preponderance that he had committed that murder (*i.e.*, acquitted conduct) and the court's failure to consider a downward

3

departure under § 5K2.0. *United States v. Lombard*, 72 F.3d 170, 174-187 (1st Cir. 1995) (vacating life sentence and remanding for resentencing, noting that "this is an extreme case… an unusual and perhaps a singular case, at the boundaries of constitutional sentencing law, and does not provide an open door").

That is not this case. Here, the defendant stands convicted—by his own knowing, intelligent, and voluntary plea of guilty—of the conduct underlying the cross-referenced Guideline (§ 2G2.1). This is not a case of "the tail wagging the dog." This is a case where the defendant was charged with and convicted of possession of child pornography <u>and</u> distribution of child pornography <u>and</u> sexual exploitation of children (*i.e.*, production of child pornography); where the relevant Guidelines call for the application of specific offense characteristics that appropriately capture the gravamen of his offenses; where application of the relevant specific offense characteristics does not alter the mandatory minimum punishment available to the Court; where imposition of a Guideline sentence is not itself mandatory; and where both the defendant and the government are advocating for a downward variance from the Guideline range calculated by Probation. The First Circuit has "repeatedly—and recently—upheld the preponderance standard at sentencing." *United States v. Walker-Couvertier*, 860 F.3d 1, 17 (1st Cir. 2017). There is no basis for the Court to deviate from the preponderance standard that governs a correct calculation of the Guidelines here.

### B. The § 2G2.2 and § 4B1.5(b) Pattern Enhancements

The defendant also objects to the application of the pattern enhancements outlined at USSG §§ 2G2.2(b)(5) and 4B1.5(b), arguing both that the government has not proven that the images and videos of Minor A were created in separate instances and that, in any case, only one of the depictions comprises "sexual abuse or exploitation" as required by § 2G2.2(b)(5). PSR p. 39-40.

4

These arguments are unpersuasive, where all but one of the images show Minor A's genitals or pubic area and the data and context show that they were created on at least two different dates and for the purpose of trading with other consumers of child sexual abuse material with whom the defendant discussed his sexual interest in children.

        1.   <u>Relevant Factual Basis for Application of the Pattern Enhancements</u>

To supplement the first draft of the PSR, the government provided Probation and the defendant the following information regarding the files involving Minor A, some of which has been incorporated into PSR ¶ 21:

From the initial analysis of the images and videos depicting Minor A, it appears that there are at least two separate dates on which these images and videos were taken. These files (Videos 1 through 4, and Images 5 and 6) appear only in file paths related to the Telegram application and have files names associated with the application. They were not located in file paths that are typically associated with the iPhone photos application. The dates and times associated with these files are related to the Telegram application. It is possible that the original files were deleted from the device, and only carried on within the Telegram application, or possible that they were created within the Telegram application, but it may be impossible to determine the exact scenario. However, the associated dates and times that we do have provide some insight into when the files were possibly created.

**Video 2 and Video 4 have an associated created date of Saturday, June 10, 2023.** This is the earliest associated date for these files, whether a created or modified date, and it is also the earliest date that these files appeared to be distributed. The times associated with the videos appear to be in chronological order, showing Minor A first getting into the bathtub, and the subsequent video depicting her in the bathtub. Image 5 does not appear to have a created date associated with

5

it in the way that the video files do, but it appears to depict the same paper that reads ▬▬, and the same bathroom flooring as Video 4. Also, the water seen in Video 2 is red, and Minor A's skin appears somewhat lighter than the other videos.

A preliminary review of the **media associated with the iPhone photos application showed at least two notable files from June 10, 2023**. One video file was created on Saturday, June 10, 2023, and this file appears to depict a preschool graduation. This video file also contains Global Positioning System (GPS) coordinates that relate to the ▬▬ in ▬▬, PA. Another video file depicts a backyard of a residential home that shows adults and children, appearing to be some kind of party, and was also created on Saturday, June 10, 2023. This file also had GPS data that coordinated to ▬▬, PA.[1]

**Video 1 and Video 3 also appear to depict Minor A in the bathtub, and the associated created date is Saturday, July 8, 2023.** The bathtub water is clear in this video, and Minor A appears to have darker areas of skin resembling tan lines, which appear to be consistent with a bathing suit. The skin appears darker than in Videos 2 and 4.

A further preliminary review of the media associated with the iPhone photos application show other notable files. In particular, at least two images that depict cats were captured on Saturday, July 8, 2023, and these files have associated GPS data. A review of the GPS coordinates showed that they resolve to ▬▬.

Image 6 does not appear to have a created date associated with it in the way the video files do; it appears to have been first distributed on June 13, 2023. It also depicts a different handwritten sign that reads ▬▬" than the one seen in the other files.

---

[1] According to Google Maps, the property at this address abuts the defendant's property at ▬▬. ▬▬ is a neighborhood of ▬▬.

6

2. <u>Applicable Legal Framework</u>

The pattern enhancements apply where "the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor," § 2G2.2(b)(5), and where "the defendant engaged in a pattern of activity involving prohibited sexual conduct," § 4B1.5(b).

Application Note 1 to § 2G2.2 defines "sexual abuse or exploitation" to include conduct described in 18 U.S.C. § 2251(a) or an attempt to commit such offense. Application Note 4 to § 4B1.5 defines "prohibited sexual conduct" to include the production of child pornography.

Application Note 1 to § 2G2.2 defines "pattern of activity involving the sexual abuse or exploitation of a minor" to mean two or more instances of covered conduct, regardless of whether it involved one or more minors, occurred during the course of the offense, or resulted in a conviction. Similarly, Application Note 4 to § 4B1.5 also defines pattern as at least two separate occasions and directs that an "occasion of prohibited sexual conduct" may be considered regardless of whether it occurred during the course of the charged offense or resulted in a conviction.

3. <u>Argument</u>

The defendant assumes, without conceding, that the videos and images of Minor A were created in separate instances. PSR p. 39. The Court need not rely on such an assumption; the proffered evidence establishes, at least by a preponderance, that Videos 2 and 4 were created on an earlier, separate date (likely on or around June 10, 2023) than Videos 1 and 3 (likely on or around July 8, 2023). Specifically, both Minor A's appearance—in the second set of videos, she can be seen to have darker skin and bathing suit tan lines, consistent with the passage of a month in the summer, following her pre-school graduation—and the appearance of the water in the tub, which is colored differently in the two sets, establish that the files capture *at least* two separate instances of the exploitation of a minor / prohibited sexual conduct.

7

The defendant further argues that only one of the depictions of Minor A constitutes "the sexual abuse or exploitation of a minor," § 2G2.2, or "prohibited sexual conduct," § 4B1.5(b). This argument, premised on an incorrect assertion that such conduct does not include "sexual conduct by either the minor or the adult and there is no touching of the child's genitals," PSR p. 39-40, is unfounded.

Both Guidelines define the triggering conduct in terms of completed or attempted violations of § 2251 (production of child pornography). Sexually explicit conduct is defined, in pertinent part, as "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A). In determining whether an image contains "lascivious exhibition," the finder of fact may consider some or all of the so-called "*Dost* factors,"[2] but the First Circuit has been clear that while they "are generally relevant and provide some guidance in evaluating whether the display in question is lascivious ... these factors are neither comprehensive nor necessarily applicable in every situation." *United States v. Amirault*, 173 F.3d 28, 32 (1st Cir. 1999).

The "use" element of § 2251[3] is met "when a defendant intentionally films or photographs a minor's sexually explicit conduct." *Ortiz-Graulau v. United States*, 756 F. 3d 12, 17 (1st Cir. 2014). In cases like this one, where the recordings are surreptitious in nature and for the most part

---

[2] The factors are: "(1) whether the genitals or pubic area are the focal point of the image; (2) whether the setting of the image is sexually suggestive (i.e., a location generally associated with sexual activity); (3) whether the child is depicted in an unnatural pose or inappropriate attire considering her age; (4) whether the child is fully or partially clothed, or nude; (5) whether the image suggests sexual coyness or willingness to engage in sexual activity; and (6) whether the image is intended or designed to elicit a sexual response in the viewer." *United States v. Amirault*, 173 F.3d 28, 31 (1st Cir. 1999), citing *United States v. Dost*, 636 F.Supp. 828 (S.D.Cal. 1986), aff'd sub nom., *United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987).

[3] Section 2251 punishes a defendant who "employs, uses, persuades, induces, entices, or coerces any minor…to engage in sexually explicit conduct…for the purpose of producing any visual depiction of such conduct."

do not capture any sex acts, the Court may look primarily to the defendant's intent to determine whether the images in question are "lascivious." Here, the fact that the videos and images of Minor A depict her in non-sexual situations does not undercut a finding that the images are "lascivious exhibitions" and thus constitute "sexually explicit conduct;" the defendant clearly valued them for their ability to satisfy the lust of those to whom he traded them in exchange for child sexual abuse material that satisfied his own desires (*i.e.*, little boys). *See United States v. Goodman*, 971 F.3d 16 (1st Cir. 2020) (upholding conviction on plain error review, where defendant surreptitiously filmed child undressing and entering and exiting shower, capturing genitals); (*United States v. Holmes*, 814 F.3d 1246, 1252 (11th Cir. 2016), *cert. denied,* 137 S. Ct. 294 (2016) (joining the Eighth, Ninth, and Tenth Circuits in holding that a lascivious exhibition may be created by an individual who surreptitiously videos or photographs a minor and later captures or edits a depiction, even when the original depiction is one of an innocent child acting innocently); *United States v. Miller*, 829 F.3d 519, 526 (7th Cir. 2016), *cert. denied,* No. 16-6925, 2017 WL 2722443 (U.S. June 26, 2017); *United States v. McCall*, 833 F.3d 560, 564 (5th Cir. 2016), *cert. denied,* 137 S. Ct. 686 (2017) (no special *per se* rule for surreptitious recording cases that requires an affirmative display or sexual act by a minor to qualify as "lascivious exhibition"). While Video 3 is the only imagery of Minor A wherein the defendant is seen *touching* Minor A's vagina, the other imagery at issue here contains the lascivious exhibition of Minor A's genitals in a way that is clearly designed to elicit a sexual response in the viewers (*i.e.*, Telegram recipients) of the imagery.

The defendant's reliance on *Gleich* and *Howard* for the proposition that the images produced in this case do not constitute child pornography similarly misses the mark. *See* PSR p. 39-40. This is not about the child's buttocks; Minor A's vagina becomes visible in Video 1 precisely because the defendant (the adult giving Minor A a bath) splashes water on that part of

9

her body while filming to remove the soap bubbles that obscure the child's genitals from the camera. This is not a normal bath routine; it is the intentional filming of the child's genitals in a way that makes the video valuable to other Telegram users who are interested in child sexual abuse material. The defendant distributed the video to such users on at least July 7, 2023, July 9, 2023, and July 18, 2023. *See* PSR ¶¶ 24-26.

Similarly, in an exchange with another user on or about June 11, 2023, the defendant distributed Video 2 and received three messages that can be inferred to be imagery depicting the other user's "son," based on the defendant's response ("Cute kid!") and the fact that shortly thereafter, the user sent additional CSAM. PSR ¶ 24. The defendant and the other user both refer to "playing" with their children, which, in the context of the child pornography-focused Telegram chat ▇▇▇▇▇▇▇ and the other child pornography material located in the defendant's phone, the Court can infer includes sexually explicit activity. Like Video 1 and Video 3, Video 2, Image 5, and Image 6 all show Minor A's exposed genitals or pubic area, and Video 4 may fairly be viewed against this entire backdrop as an attempt to do so. *See, e.g., United States v. Rider*, 94 F.4th 445, 457-459 (5th Cir. 2024) (evidence sufficient for attempted violation of § 2251 where defendant set up recording equipment with intent to capture imagery of minor in shower). The fact that several of these depictions—Video 4, Image 5, and Image 6—were branded with the "▇▇▇▇▇▇▇ group name, and that *all* of them were distributed to other users from at least June 11, 2023 through March 24, 2024, and typically accompanied by a request for other CSAM files in return, underscores the conclusion that this is certainly not innocent imagery, even though Minor A herself may have been an innocent subject.

Careful consideration of the imagery, in the context of the facts and circumstances present in this case, can only lead to one conclusion: that they do, in fact, depict the lascivious exhibition

of Minor A's genitals. The evidence establishes that the defendant engaged in a pattern of "the sexual abuse or exploitation of a minor," § 2G2.2, or "prohibited sexual conduct," § 4B1.5(b), and the corresponding enhancements apply.

Finally, the defendant posits, in his objections, that both Probation and the Court should review the "small number" of images and videos depicting Minor A that were recovered from his phone to "understand what they are—and are not—in order to fully evaluate 'the nature and circumstances of the offense' and to adjudicate the Guidelines calculation" arguments of the parties. The government agrees that while not necessary to find that the government has satisfied its burden at this juncture, such review may be helpful to the Court, and will make the images available for review in camera at the Court's convenience.

## II. Restitution and Special Assessments

The government has identified victims from 181 known series in the defendant's collection of child pornography. Of those victims, the following 13 (and/or their family members) submitted victim impact statements in connection with the sentencing hearing: John Doe II; John Doe III; John Doe IV; John Doe V; Sponge B "Andy"; Dalmatians (C); Dalmatians (Ke); Dalmatians (Ky); April; SuperHero Boy 1; Surfer Hair "Jessy"; Sweet White Sugar (Pia); and Vicky ("Lily").

Eight of those victims, all of whom are represented by counsel, have asked the government to make restitution requests on their behalf, as follows:

1. John Doe II requests $5,000.
2. John Doe III requests $5,000.
3. John Doe IV requests $5,000.
4. John Doe V requests $5,000.
5. April requests $10,000.

      6.      Jessy requests $5,000.

      7.      Pia requests $7,500.

      8.      Lily requests $10,000.

Minor A's family members have also submitted victim impact statements, and the government has recently submitted a restitution request on behalf of Minor A to the defendant in the amount of $65,722.74. The parties have conferred preliminarily, and believe that they may be able to come to agreement regarding an appropriate award for some or all of the victims in this case. This Court need not make a determination of restitution at the sentencing hearing, but must do so within 90 days of sentencing, pursuant to 18 U.S.C. § 3664(d)(5). The government therefore requests that the Court schedule a date after the sentencing hearing, by which date the parties must submit memoranda, either jointly or separately, advocating for an appropriate award for each victim who has demonstrated the right to restitution. It is not clear at this point whether a hearing will be necessary to adjudicate the claims that have been submitted. The parties will alert the Court in advance of the sentencing hearing.

In addition to mandatory restitution and the mandatory assessment assessed under 18 U.S.C. § 3013, the defendant is liable for special assessments on all three counts of conviction pursuant to 18 U.S.C. § 2259A (the "AVAA assessment"), subject to his ability to pay. The collection of restitution takes priority over any AVAA assessment levied. *See* 18 U.S.C. § 2259A(d)(2).

### III.      Application of the Section 3553(a) Factors

Based on an evaluation of all of the § 3553(a) factors, the government believes that its recommended sentence appropriately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; affords adequate deterrence to criminal

conduct; and protects the public.

The government recognizes that it is difficult to quantify exactly how many years would satisfy the Court's obligation to impose a sentence that achieves these goals of sentencing. It goes without saying that a significant sentence is necessary to reflect the gravity of the defendant's crimes. For this defendant, that means decades.

Here, the defendant was in a position that inherently triggered and required the trust of the community. Of his patients' parents. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. He violated that trust in ways that *should be* unimaginable for a person in his position, taking advantage of his ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ across multiple visits, and once, apparently, on the day she graduated preschool.

What is certain is that this is not a case that merits the imposition of the minimum possible sentence or anything close to it. The conduct giving rise to the charges in this case are not solely the product of mania, acting out, or poor decision making, PSR § 79; the defendant made a series of intentional, manipulative, well thought out decisions for the sole purpose of satisfying his depravity. He joined secret groups dedicated to the trafficking of child pornography, communicated one on one with members of those groups, and used ▓▓▓▓▓▓▓▓▓▓▓▓▓ as both an entrance fee to at least one specialized group and as currency to obtain the specific type of child sexual abuse material *he* wanted from others who wanted what he had to give.

This conduct is reprehensible and betrays the trust bestowed in him automatically by ▓ ▓▓▓▓▓▓▓▓▓▓▓▓ mother, and the rest of her family – the ones who will be left to support Minor A as she transitions from early childhood through adolescence to adulthood and as she has to grapple with the eventual understanding, confusion, and betrayal, on top of the potential shame and lasting distress that this Court has seen repeat across the accounts from other victims depicted

13

in child sexual abuse material recovered from the collections of child pornography offenders throughout the country. It has long been recognized that it is almost certain that the victims here will be dealing with the consequences of the defendant's depravity for years to come.[4]

The defendant's crimes are especially disturbing given his chosen vocation: a pediatric anesthesiologist. That is, a doctor – one of the most revered members of society. But not just any kind of doctor; one who *specializes* in treating children, who are entrusted to his care while at their most vulnerable – while unconscious on an operating table. Minor A, of course, was not unconscious when she was victimized ███████.

To be clear: the defendant's offenses involve the trafficking of child sexual abuse material, which is extremely serious because it both perpetuates harm to victims and normalizes and validates the sexual exploitation of children. This is especially true here, where the defendant accessed child pornography in a forum populated entirely by others who *value*, rather than vilify, the sexual exploitation of children, and in ways that typically are successful in avoiding detection

---

[4] In its *Report to Congress: Federal Child Pornography Offenses*, Ch. 5 Victims of Child Pornography (December 2012), the Sentencing Commission explained that "[c]hild pornography victims face other types of victimization that are separate from the harm of production. Even after the physical abuse has ended, child pornography victims suffer due to continued circulation of their images or the ongoing potential for circulation of their images." *Id*. at 112. The Commission emphasized that, unlike child sex abuse victims whose abuse was not memorialized, child pornography victims experience a greater long-term risk of depression, guilt, poor self-esteem, feelings of inferiority, interpersonal problems, delinquency, substance abuse, suicidal thoughts, and post-traumatic stress disorder. *Id*. at 113.

Studies on victims of child pornography also indicate that the child's original psychological harm continues into adulthood and impacts their ability to form healthy relationships with others. *See* John E.B. Myers, et al., The APSAC Handbook on Child Maltreatment (2d ed. 2002). The symptoms of distress exhibited by child victims of sexual abuse continue after the actual sexual exploitation to the time of disclosure and into the post-traumatic phase as well. *Id*. at 59-62. In cases of online child pornography, where the crime is perpetuated by the continual circulation of the child's images, these symptoms of distress are likely to continue with each new distribution and possession.

by law enforcement. The defendant fits squarely within the cycle of supply and demand that fuels the networks that not only cater to CSAM consumers like him but are driven by the need that they represent.

Here, he plays both roles: consumer and creator. This conduct also involves a hands-on offense that is forever memorialized and is already in the hands of strangers. In other cases involving hands-on offending by defendants charged with violations of 18 U.S.C. § 2251, courts have often imposed sentences reflective of the seriousness of such offenses. *See*, *e.g.*, *United States v. Joyner,* 24-CR-10057-DJC (unemployed defendant who produced child pornography of ▮▮ with ▮▮ over whom he had ▮▮ sentenced to 22 years, with government recommending 45 years); *United States v. Ubeda,* 23-CR-30016-BEM (defendant who extorted third party into producing child pornography with ▮▮ sentenced to 40 years consecutive to 10 year state sentence for similar conduct); *United States v. Benoit*, 22-CR-30014-MGM (defendant with no scored criminal history sentenced to 46 years for producing child pornography of two minor children, including daughter, and possessing hundreds of other files of child pornography; government recommended 55 years); *United States v. Raymond*, 20-CR-10222-RGS (government recommended, and court imposed, 60 year sentence for 65-year-old defendant with no record for producing child pornography depicting his sexual assaults of two minors and surreptitiously recording others); *United States v. Nieves*, 19-CR-10367-DJC (21-year-old transgender defendant with significant history of abuse and self-harm and no record sentenced to 30 years for producing and distributing child pornography depicting her hands-on abuse of child known to her; government recommended 40 years); *United States v. Decarolis*, 19-cr-40038-TSH (defendant who produced child pornography involving five minors sentenced to 38 years); *United States v. Sheehan*, 18-CR-10391-RGS (50-year-old defendant with no record who produced child

15

pornography involving his sexual assault of three minors sentenced to 45 years; government recommended 60 years. Defendant was later resentenced to 17 years following remand on appeal overturning denial of motion to suppress); *United States v. Lee*, 18-cr-10105-IT (defendant who used messaging application to direct New Hampshire male to produce specific child pornography depicting sexual abuse of child known to that person sentenced to 20 years; defendant who sexually abused the child in producing the material sentenced to 50 years in D.N.H. in 18-cr-00004-LM); *United States v. Anthony DeOrdio*, 18-cr-30056-MGM (defendant who created child pornography depicting sexual abuse of one child known to him after having been previously convicted of a child pornography offense sentenced to 50 years); *United States v. Jonathan Monson*, 18-cr-30015-MGM (defendant who created child pornography depicting sexual abuse of one child known to him sentenced to 40 years); *United States v. Toronto*, 17-cr-10307-FDS (defendant who produced child pornography depicting sexual abuse of two children known to him sentenced to 40 years); *United States v. Germaine*, 17-cr-30010-ADB (defendant who created child pornography depicting sexual abuse of one child known to him sentenced to 35 years pursuant to plea agreement).

The recommended sentence is entirely reasonable and warranted in this case, notwithstanding the fact that it is, objectively, very high. As outlined in the PSR and above, the defendant embarked on an abhorrent course of conduct rooted in the predation of a child he knew would not tell. The pain and devastation that he left in his wake is hard to overstate. The videos and images he created will last forever and may very well resurface for Minor A in the same way the other images and videos in his collection have resurfaced for the other victims who have submitted impact statements. The foreseeable consequences of this callous, self-centered predation include an amount of time in prison commensurate with the nature and circumstances of

his offense and the need to prevent him from ever doing it again.

The government has considered the defendant's history and characteristics, as they are outlined in the defendant's sentencing materials and the PSR. While the government recognizes that the defendant reports ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, that history underscores the compelling aggravators present here. Despite ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, the defendant has shown minimal insight[5] into, or empathy for, the harm suffered by his victims – all of them, including the hundred-plus children who were raped, assaulted, and otherwise exploited to create the imagery that the defendant sacrificed ▇▇▇▇▇▇▇▇ to get his hands on. Regardless of what led the defendant to capitalize on the vulnerability of Minor A, he did it, and the harm perpetrated on her is the same regardless of his motivation. The fact that the defendant does not understand the scope of that harm, despite his professional training and status as a mandated reporter, should undercut any confidence this Court might have that he is unlikely to recidivate if not incapacitated.

This is one of the most serious crimes that is prosecuted in federal court. It should be treated as such. There is no reason to believe that anything but a truly lengthy term in prison (which, for this defendant, might very well be for a large portion of his adult life) will deter the defendant and others from committing similar offenses in the future. The defendant's claim that "mania negatively impacts his judgment and decision making" and "contributed largely to his involvement in the instant offense," PSR ¶ 79, does not mitigate his responsibility or dangerousness here. The defendant exploited ▇▇▇▇▇▇▇▇▇▇ on multiple occasions – first, by

---

[5] *See, e.g.*, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ "I don't really think that I do [have an attraction to minors]. When I'm in a certain mood or state of mind I want to go toward it. I would never put my hands on a child or harm a child."

posing her and creating permanent sexualized imagery of her, including one image showing him touching her vagina; and then by repeatedly distributing that CSAM to various other users. That conduct—using Minor A as currency to get child sexual abuse material featuring *other people's children*—was not limited to the time surrounding his father's death. It continued until at least March 2024. And his interest and trafficking in CSAM was ongoing; he was active in the Telegram groups until just a few days before he was arrested. This is not isolated, aberrant behavior.

Furthermore, any assessment that the defendant bears a low risk to recidivate must be met with skepticism when it fails to take into account the fact that he has, in fact, already recidivated. Tragically, ████████ attempts to sound the alarm in 2018—████████ —went unheeded. According to ████████ ████████, she attempted to report her observations of the defendant's receipt of child pornography, but the reports went nowhere. The defendant himself admitted to Probation that this happened. PSR ¶ 69 ("she also discovered sexually explicit photographs involving young boys").[7]

Similarly, the fact that the defendant comes before this Court with no prior record is not a mitigating factor in the context of these offenses. The defendant's record was taken into consideration in the calculation of his criminal history category. *See, e.g.*, *United States v. Oberg*, 877 F.3d 261 (7th Cir. 2017) (district judge properly noted that defendants in child pornography cases often have limited criminal histories). In this case, where his (uncharged) prior child

---

[6] The government offered a copy of this 73-page report, ████████ ████████, as an exhibit at the defendant's detention hearing. It is available at the Court's request.

[7] Yet, the defendant told ████████ that his first time seeing child pornography was when a sexual partner introduced him to Telegram in 2022. ████████

pornography offenses are documented and were brought to the attention of a court, *this* Court cannot trust in the defendant's motivation or ability to refrain from offending in similar ways in the future.

## CONCLUSION

The government recognizes that it is always difficult to quantify in months or years how much is "sufficient" to achieve the goals of sentencing. In this case, that calculus leads to a term of years that will incapacitate the defendant. While the government's recommended sentence here is significant in length, it is not only reasonable, but also necessary in this case to promote respect for the law, to adequately punish the defendant for his criminal conduct, to deter him and others from offending in the same ways again, and for long-term protection of the public.

For all of the foregoing reasons, the government respectfully recommends that this Court impose a sentence of 45 years' imprisonment, to be followed by five years of supervised release. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

The government further requests a hearing within 90 days to resolve the outstanding requests for restitution.

                                                      Respectfully Submitted,

                                                      LEAH B. FOLEY
                                                      United States Attorney

Date: January 22, 2026        By:    /s/ Anne Paruti_____
                                                      Anne Paruti
                                                      Jessica L. Soto
                                                      Assistant United States Attorneys
                                                      United States Attorney's Office
                                                      One Courthouse Way
                                                      Boston, MA 02210
                                                      617-748-3100

## CERTIFICATE OF SERVICE

I, Anne Paruti, hereby certify that the redacted version of this memorandum was filed through the Electronic Court filing system and will be sent electronically to the registered participants identified on the Notice of Electronic filing and the unredacted version was sent to counsel of record by email.


Date: January 22, 2026                                              /s/ Anne Paruti
                                                                                     Anne Paruti
                                                                                     Assistant United States Attorney